UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 21-CR-01623-JLS |
| Plaintiff, | Friday, June 20, 2025 |
| v. | Courtroom 4D 9:30 A.M. |
| SHANE NGAKURU (13), | Sentencing Hearing |
| Defendant. | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
PAGES 1 THROUGH 27

BEFORE THE HONORABLE JANIS L. SAMMARTINO

UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Plaintiff: UNITED STATES ATTORNEY'S OFFICE
880 Front Street, Suite 6293
San Diego, California 92101-8807
BY: MIKAELA WEBER, AUSA
PETER HORN, AUSA

For Defendant: WARREN & BURSTEIN
501 West Broadway, Suite 240
San Diego, California 92101
BY: JEREMY WARREN, ESQ.

Reported By: Stephanie Whitehead, RDR, CRR
District Court Clerk's Office
333 West Broadway, Suite 420, San Diego, California 92101
*(Reported stenographically; transcribed via computer)*

**FRIDAY, JUNE 20, 2025; 10:56 A.M.**

* * *

*THE CLERK:* Matter number 7: 21-cr-1623, United States of America v. Shane Ngakuru for sentencing.

*MR. WARREN:* Good morning, your Honor. Jeremy Warren for Mr. Ngakuru who's present in custody

*THE COURT:* Thank you. Good morning to both of you.

*MR. HORN:* Good morning, your Honor. Peter Horn and Mikaela Weber for the United States.

*THE COURT:* Thank you.

The Court has read and considered the following documents for sentencing this morning: I have the presentence report. I have the defendant's sentencing summary chart, defendant's sentencing memorandum with a bunch of letters from some fellow inmates who spent some time with you in Thailand, from your sister, friends, brother, your wife, mother to your child, and cousins. I've got the Government's sentencing memorandum, the Government's sentencing summary chart and the underlying plea agreement.

Is that everything?

*MR. WARREN:* Yes, your Honor.

*THE COURT:* Okay. I'm going to follow the calculation that both you and the Government are

recommending. I think it's an accurate one. Probation has a different calculation, and they reach a recommended sentence of 135 months. You're at time-served at 32 months for the defense, and the Government's at 72, just above the low end of their guideline range.

I understand this case. It's an interesting case. It's a unique case. So when I get to sentencing disparities, I'm looking internally not externally in this case. But your client was a distributor. One thing that jumped out at me a little bit about your client's role in this -- and I understand, I think, what you're going to say about it -- he was in this a little bit longer than other folks, as I see it. He was in this distributing and doing his job, so to speak, in this conspiracy from October of 2019 to June of 2021, a little bit longer than some of the other people I've seen so far.

I understand your point. There's no prisoner transfer treaty with New Zealand, and he's going to face prosecution in his home country. I understand and accept -- I don't know what the Government's going to say about it, and we'll hear from them -- that that's the reason he didn't safety valve, on advice of Counsel from New Zealand that he shouldn't be saying things here that could be used back there.

I understand his upbringing. I understand the role

that COVID played in all of this, and that the conditions in the Thailand prison were not -- were not good conditions; that he was on the technical side of things, not the drug side, which is --

*MR. WARREN:* No, the other way around, your Honor.

*THE COURT:* The other way around? He was on the technical --

*MR. WARREN:* He was more basically using -- he was very unsophisticated on the tech side. He was more on the drug side.

*THE COURT:* On the drug side.

*MR. WARREN:* Yeah.

*THE COURT:* Not technical; he was on the drug side, but, even at that, you're saying it was more limited.

*MR. WARREN:* Correct.

*THE COURT:* Okay. But the Government's pointing out the money laundering, the longer period of time, and everything else that went on. Everybody here -- you know, because you've been in my courtroom watching the other defendants, Mr. Warren --

*MR. WARREN:* One or two.

*THE COURT:* -- at least some of them. But you know what I've sentenced other people to, as does the

Government. So go ahead. I'm probably maybe a little below where the Government is, but I'm certainly not at time-served, sir.

*MR. WARREN:* I understand. And I'll just say this isn't a time-served case other than the weird thing that's going on within New Zealand.

*THE COURT:* Oh, I get this. This whole case has been unusual.

*MR. WARREN:* Yes. So I really appreciate the Court's comments. Thank you very much your Honor. And I'll, I think, hone in -- home in on what the Court is talking about.

First of all, on the guidelines, we all agree. And I don't speak for the Government, but I don't think they have a big quibble with his inability to go in for safety valve. And it's not like a typical case where there is a dispute over safety valve. Even within this case there's been some dispute over safety valve as to whether someone's been honest, holding back. I mean, none of that is going on here. He has a legitimate thing, and I have the letter here from his lawyer saying I'm instructing you not to talk, and I think everybody gets that and it makes sense.

So there is the length of time. And I think almost all the defendants were involved for months and months and

months. What happened here with Mr. Ngakuru is he was living in Thailand. He had his little boy, and he started his gym and nutrition business. Now, that's the -- I mix up Jekyll and Hyde. That's the Hyde part. The Dr. Jekyll part is that he was also doing some drug stuff on the side back home. He was, and he doesn't deny that. He got offered from people to become involved in ANOM. Here's the thing, your Honor: The timeline is long because he was in relatively early, and then obviously it went, you know, until the Government stopped it.

But the volume of what he was doing was minimal. He was given 50 phones. And, remember, the FBI wanted this to be spread far and wide for -- I mean, it's an amazing investigation. We all recognize that it was brilliantly executed and conceived to get real-time, actionable information about underworld people throughout the world. I mean, it was -- you know, there are books about it, right?

But in terms of how they wanted it to spread is, how do we get this out there. Like a heroin dealer, first one free. So they gave him 50 phones and said distribute this to contacts. So he knew some people in Australia, he knew some people in New Zealand, and I think one or two went to people in Thailand. They were given free use of this stuff. So he didn't make any money.

And in terms of the -- his ongoing efforts to support the system were so minimal that when we went in for what we call a reverse proffer, when the Government's saying hey, sir, you need to plead guilty, here's a presentation on the evidence -- of the evidence, they showed him a series of slides that were text messages where -- on ANOM where the ANOM higher-ups, the tech people in Europe, were taking over his computer remotely so that they could actually do the very basic tasks like just turning on devices and things like that. So he didn't make any money. We're talking 50 phones out of 11,800 that ANOM distributed.

*THE COURT:* You're saying that 50 phones is the total?

*MR. WARREN:* That's what we -- that's what I believe. Now, even if it were double that --

*THE COURT:* Even if it were double, it's a small number. Okay.

*MR. WARREN:* -- it's a small number. And, in fairness, every single defendant was involved in drugs.

*THE COURT:* Right. Right.

*MR. WARREN:* Okay. Every single defendant was involved as a distributor --

*THE COURT:* Right.

*MR. WARREN:* -- to date, but within that, you had

some pretty high-level distributors like Dmitrienko, who was in Europe and was trying to distribute this stuff throughout Eastern Europe, Russia, Ukraine, Estonia. People writing user manuals, I think it's Kumar and -- I want to say Elhassen, but who is it? It's Zakhimi who wrote -- the Court has sentenced. Both who said, "We're 24/7 tech people. We wrote the user manual." And by contrast you have Mr. Ngakuru who couldn't understand any of this stuff, and to the point where he -- there's a text message where he says can you put this guy under me, meaning can you just deal with him, and he's in Australia and he can deal with these people.

So what did Mr. Ngakuru get out of it? He got a phone. He got his own ANOM phone, and he got intercepted. And I think a big reason why he's here today is he got intercepted doing some stuff he shouldn't be doing with regard to methamphetamine in his home country.

So, your Honor, among the defendants where we have 41 months on the low end, 63 months on the high end, when you look at the one defendant who got 63 months, that was Elhassen. And I think, your Honor, that was the first sentencing the Court did. There was an argument over aggravating role, and the Government was starting way, way high. I mean, I think they recommended below guidelines' 83 months or something like that. And your Honor had to

make a tough decision about aggravating role, and you recognized that, you know, role influenced zero-point offender and safety valve too. And so the Court granted that, and so you came way down from where the Government was at and then gave him 63 months.

After that, every sentence got lower: 51, 47, 41, until Dmitrienko, and then it popped back up. And I think that guy, he clearly was a real player. And even at the sentencing hearing the Government said he was one of the most -- the highest level of the distributors.

So I think within that range, you know, the Court has sentenced between 41 and 57 for everybody else. And here's my thing: Your Honor already mentioned it, so I won't belabor the point. He really is unique in that he has to -- he cannot do a prisoner transfer. I had another New Zealand client in front of your Honor, and we dealt with it then too. There is no prisoner transfer treaty. So here's a gentleman who grew up speaking English -- he's from New Zealand -- but he's been hauled across the world in custody. He's been here. He has no family, no friends, no nothing here.

Now, to his credit -- and your Honor mentioned the letters from the prisoners. I mean, this is a guy -- he's such a pleasure to be around. He's just an upbeat, positive guy. Even in the Thai Bangkok Hilton, ironically

called, he was the guy that foreigners would go to, and he'd give them food and water and -- you know, for free. He would just give it to them because he wanted to help. He's done the same thing here. He's teaching classes and -- you know, he's a workout guy, so he's teaching them Thai kickboxing and stuff like that.

But in any event, he had deplorable conditions. We cited, I think -- it's not Amnesty International but a report about that. And so he can't go back home to finish his time, but he is going to go back home in custody, and he's going to face decades in prison. I mean, I talked to his barrister in New Zealand, and he said there's 70 counts. Most of them are ANOM related. We have an e-mail from the police in New Zealand that says, "Oh, yeah. We have a warrant for him. We have a red flag in Interpol. He's coming back to New Zealand in custody."

So, you know, his drug -- like a lot of times, your Honor, we have drug traffickers from around the world that are brought here, but there's always a nexus, a connection to those drugs in the United States. I mean, Colombians with their cocaine coming up here, Mexican nationals who were sending all kind of drugs up here. What we don't really see is a guy who was doing something wrong but in -- literally halfway around the world.

*THE COURT:* So there's no nexus here in your

opinion?

*MR. WARREN:* No nexus on the drugs.

*THE COURT:* On the drugs?

*MR. WARREN:* Correct. Yeah.

*THE COURT:* Okay.

*MR. WARREN:* And, you know, he showed up after most of the litigation was gone -- done. And, you know, your Honor, you didn't mention it. I did mention it so I just want to remind the Court. He really was the spark plug for the global resolution that took place. I think the Government will agree things were sort of stuck. The Court had ruled on some things, the case was sort of moving towards trial, and it was really Mr. Ngakuru who not only through counsel but, in the jail, was really encouraging people like what are we doing here? Let's -- let's get this resolved.

And we had a lot of back and forth with the Government. Obviously, the Court wasn't involved, but it -- it did -- this is the kind of case that needs to resolve, and it did resolve, and I think he should get some credit for that. And I'm not saying it's, you know, 5K or anything like that. I'm just saying it's part of the 3553 factors. So, your Honor, look. At the end of the day, I think your Honor probably has some idea of a number in mind, but I really think between 41 and 57 is

really the range that everybody else has gotten, other than that first case. And, you know, I think the longer he's here we're just paying for him to sit here waiting to go back home and face justice there. And I think if you talked to the New Zealand authorities they'd say send him. Send him now. And we can't. So what are we doing? So that's my request, unless the Court has any questions.

*THE COURT:* No questions, Mr. Warren. Thank you.

Good morning, sir.

*THE DEFENDANT:* Good morning.

*THE COURT:* You have an opportunity, if you would like, to speak on your own behalf before sentence is imposed.

*THE DEFENDANT:* Okay. Yeah, I've got something that I can say.

I would like to say that I take full responsibility in all my actions. I've hurt a lot of people close to me, especially my son, Kirby. The loss of my mother and stepfather has been very hard on me. Being in jail almost three years has given me time to think about how my choices impacted others, definitely -- and it definitely has helped me change my views in life to make the right choices in the future. I would like to say that I'm really sorry and very remorseful. Thank you.

*THE COURT:* Okay. Thank you, sir. I appreciate

those comments.

Mr. Horn, go ahead.

*MR. HORN:* Thanks, your Honor. I'd like to address a few things in kind of three categories: His own conduct, how he's approached this case, and then the Court's sentence in light of the potential New Zealand charges, and the other sentences in this case so far.

I think it's fair for the Court to assume it's approximately or at least 50 devices -- between 50 and 100, I think that's fair to say for today's purposes. That does not mean that it's insignificant. He was involved early on, and early on for a reason: Because he had been involved in these type of communications platforms like Sky, Cipher, and other devices like this. And his connections to Comancheros, and criminal groups in that part of the world in particular, was significant.

And just for a little background -- we haven't belabored the history, you know, of these types of devices too much in this case, but for a little background, when this type of like hardened encrypted device really got prominence, and there's more, I'd say, law-enforcement-related press about it, it arose initially in Australia with Comancheros and other criminal motorcycle groups who used Phantom Secure, in particular, extensively. And it was a powerful tool for them. It was

used extensively, and not just in Australia. It was really -- it was used extensively there, but it grew around the world. Phantom Secure, of course, that was taken down. The case -- the 18-cr case before Judge Hayes is a Phantom Secure related indictment. Not technically related, like the PSR reports, but there's an indictment for Phantom Secure in this district.

Phantom Secure, Sky, Ciphr, EncroChat, ANOM -- there were several others -- and the history of Australian and New Zealand outlaw motorcycle groups is just closely, closely connected to the use of dedicated encrypted communications devices like ANOM. I say that because his role and his connection to those groups was very significant. So let's say it was just 50 devices. Who were his contacts? These are -- these are violent international groups. Comancheros is a primary one that he had a close affiliation with, and then involved, yes, for a longer period of time.

While his overall numbers, the Government agrees, are not as high as defendants like Dmitrienko, Ayub, Hosseini, who this Court will see here soon, but they're nonetheless significant. The Government agrees he was more ultimately involved in, let's say, the predicate offenses, the actual drug trafficking, than he was on the tech side. That's not necessarily mitigating. And I think as this Court has

heard at other sentencing hearings too, it becomes easy for the defense -- for any one of these defendants to say, well, he was more involved in tech but not in drugs, or he handled the money but not drugs, or he handled the drugs, but he wasn't involved in the tech. That's not necessarily mitigating defendant to defendant to defendant. What it shows here is, he was important to the enterprise, and he was very involved in drugs and money laundering.

But of all the defendants this Court has seen, I think he had his hands on drugs and involved in drug transactions more than any other defendant the Court has seen so far. I think that's apparent in some of the facts in the factual basis and our sentencing materials, but he was -- he was quite involved.

Now, turning to his kind of tech involvement or on the enterprise -- the enterprise aspect of it, did he ask for instructions? Did he get guidance on how to use the portal, on how to set himself up as an agent for other criminal end users? He did. So did many others. He learned how to do that and he was an agent. That helped him distribute devices, manage subscriptions. So is it necessarily mitigating that he had to get help in the first steps setting up devices? The Government doesn't think so. He made those steps and he kept going. And he

helped wipe devices too, as the Court has seen. So he wasn't totally ignorant of the technical side, but especially involved in the drugs and money and guns, as the Court would have seen from our memorandum too.

I think the second overall bucket is how he's -- how he's addressed the case here. Briefer on this point because, one, can it be to his credit that he didn't -- he did resolve the case a little more expeditiously than some other defendants. He arrived -- he was extradited last year. He's being sentenced basically within 12 months of arriving. The reductions in the plea agreement, the combination of circumstances we believe account for that. Our recommendation we believe accounts for that too.

To the other -- the other points Mr. Warren raised that he was a spark plug, that he maybe talked to other defendants, we have no -- those are things we can't be involved in. We don't know, you know, anything or enough to be able to comment on that at all. We're aware of our conversations with Mr. Warren. The package resolution that happened with Mr. Ngakuru and the others, that's to his benefit as the plea agreement reflects. But I'd ask the Court not consider any other discussions that may have happened within defendants or what Ngakuru did, himself, because that was certainly not at our request. It wouldn't have been. And we -- we don't know enough to be

able to say anything about that. So I'd ask the Court at least set that part aside.

One other factual point before turning to kind of the last sentencing considerations: Drug nexus. There is a drug nexus here. The Court would be aware from the prior briefing on venue and dismissing the -- or denying the motion to dismiss for improper venue that there were drugs whose shipment was coordinated with ANOM devices that touched this district. Not just the U.S., but touched this district. So there certainly is -- as the Court recognized at that point too, there is a nexus to the United States. There is -- there is a drug nexus here.

Now, whether Mr. Ngakuru was personally involved in drug shipments involving the Southern District of California, maybe not, but he's a part of a conspiracy. He's a part of a conspiracy that certainly did touch the United States. And to the extent that he and others sought to avoid the United States, that was intentional, as many messages in this conspiracy reflect that there is often an intention to try to avoid so-called Five Eyes countries and the U.S., and try to avoid law enforcement attention. But, in any case, I'd ask the Court not to consider the idea that there may not be a drug nexus here when there in fact is, and the conspiracy involved the United States and, in fact, this district.

I think the final points are where this Court should end up in light of the substantial New Zealand charges and what the Court has sentenced other defendants to. Seventy-two months we believe is appropriate based on other defendants' sentences. Mr. Elhassen's, as far as the Court is thinking of him, I think the numbers of devices that he and Mr. Ngakuru distributed are probably roughly similar, let's say around 50 or less than 100 for each of them. Yeah, roughly similar.

Now, did they -- they had different territories, if you will. Mr. Elhassen's, as the Court knows, he was key to Colombia, worked directly with the cartels. Mr. Ngakuru, was he there? No, but he had a comparable, and, in fact, pretty similar analogous situation based in Thailand working with the Comancheros and others. Not only that, he was hands-on with drugs, hands-on with money much more than Elhassen was.

And as the Court -- as the Court recognized, Mr. Elhassen's sentence, even with the benefit of safety valve -- and last week the Court said -- you know, recognized that we didn't recommend that. That's because we were recommending the aggravating role and so couldn't recommend safety valve at the same time. When we were asked if he would satisfy safety valve, we quickly acknowledged that, yes, he would. So that's another

difference between Elhassen and Ngakuru. It's kind of a bridge to the New Zealand aspects and the prisoner transfer issues.

We don't have enough information to be able to say whether he, you know, really should or shouldn't debrief for purposes of his New Zealand offenses. To my mind -- I don't know. That's really a New Zealand law question if and to what extent any statements here could be used against him there. I don't know. To my mind, the only way they would be potentially usable is through a mutual legal assistance request where some of his statements would also be subject to, you know, disclosure to New Zealand about that. That hasn't -- that hasn't happened, and I think we just -- we're not in a position to be able to evaluate that claim that he shouldn't do so for purposes of his New Zealand charges.

And then what role should those charges play in the Court's sentence here? We don't know the details of what charges he's facing. From our understanding so far, they involved some ANOM communications, but they are distinct from the RICO conspiracy and the charges he's facing here, potentially other drug trafficking, other money laundering. But what he's facing is uncertain right now. If he's convicted, the penalty he's facing, that's uncertain too. I think what this really goes to is the

need for the Court to sentence him based on the charge and the conduct before the Court and not with the potential uncertainty of other charges in mind. Is he facing other charges? Yes, it looks so -- it looks like it. But from the Government's perspective, that is not a reason to reduce the sentence he's given here.

*THE COURT:* Okay. Thank you.

Probation?

*PROBATION OFFICER:* Nothing additional. Thank you.

*THE COURT:* Go ahead, Mr. Warren.

*MR. WARREN:* Just a couple of points, your Honor. I mean, the Government says "he may be facing charges." They know he's facing charges in New Zealand. And I actually have -- I can't even read it -- 70 counts that he's facing that the lawyer in New Zealand sent me. I also have -- you know, this is a 32-page summary of the case from the New Zealand police and from law enforcement there that talks about ANOM and all this other stuff. So there's zero doubt that he's facing charges. I mentioned at the beginning, we have the e-mail from the police officer in New Zealand saying we have a red notice for him. He will be coming here in custody. So he absolutely will be facing charges for that.

A couple points I think really to help for the

Government's benefit going forward. When I say there's no nexus here to the drugs, I just mean to the drugs that -- we're not making a legal argument that there's no nexus.

*THE COURT:* Right. Right.

*MR. WARREN:* The drugs that -- everyone knows they were going to New Zealand and had no ties to the United States whatsoever. And he's being -- he's facing punishment for that.

Also, your Honor, when you look at relative culpability and you look at the drugs, you know, you have people here -- what he admitted in his plea agreement were a few kilograms of methamphetamine. That's wrong. But that's everyday at the San Ysidro Port of Entry. That's one border bust, okay?

You had other defendants in this case who were involved with submersibles or submarines with hundreds of kilos of cocaine. You had people talking about getting fishing boats with hundreds of kilograms of cocaine. And I think that, like, when you look at, for example, Nikitovic, who the Court imposed the lowest sentence on, 41 months -- and I think there may have been a Government motion there. There's under-seal filings.

*THE COURT:* The Government was recommending 41.

*MR. HORN:* I'd just object. There isn't a basis to speculate about whether there are sealed filings or

what may be in them.

*THE COURT:* Well, we don't know why you recommended what you recommended, but it's absolutely relevant to talk about codefendants in this case --

*MR. HORN:* 777agreed.

*THE COURT:* -- for internal sentencing disparities.

So go ahead, Mr. Warren.

*MR. WARREN:* Their initial sentencing chart said 51 months. I'm assuming there's under-seal filings because there's a government sentencing memo for everybody else but not for Nikitovic. But he said in his plea agreement that he had done nothing legal in the last 40 years, and he was involved in drug shipments from Colombia. So he's a significant player, and I think that his conduct is way worse than Mr. Ngakuru.

And so, your Honor -- well, I've said everything I want to say. I think the Court should be somewhere between 41 and 57, and I think closer to the lower end of that. And with that I'll submit.

*THE COURT:* Okay. Mr. Horn, do you need to respond to that, sir?

*MR. HORN:* No, I don't think so. Thank you, your Honor.

*THE COURT:* Okay. Well, this case has been a

challenge every step of the way, and it continues to be. I have adequate information to exercise sentencing discretion this morning, and I will begin, sir, by making the necessary guideline findings and explaining as I go through this.

We're starting with a base offense level of 34, and because of money laundering, we're adding a plus 2, resulting in an adjusted offense level of 36. You've accepted responsibility for what you did here, and you have no criminal history points. A three-point reduction and a two-point reduction, resulting in a total offense level of 31.

Because you have no criminal history points, you're in Criminal History Category I, and if we stopped here at offense level 31, Criminal History Category I, we're looking at 97 to 121 months in custody, but we're not finished. You get a four-point reduction for appellate waiver and a packaged resolution and combination, which takes me down to an offense level of 27, Criminal History Category I, and that's a range of 70 to 87 months.

So the question is this: Are you appropriately in that guideline range or should I vary downward? This is what I consider, sir. I consider everything about you, your history, your circumstance. I consider everything about the offense, unique as it is. I've been doing this

a very long time, haven't ever seen a case like this before. And the motions that were brought, the challenges of this case were unique on both sides of the equation, both for the defense and for the Government.

I consider promoting respect for the law. I consider protection of the public. I consider general and specific deterrence, and I consider sentencing disparities. When I get to sentencing disparities, again I have to point out, I can't compare this to any other case I've had, so I'm looking internally to sentencing disparities with the other defendants which, as I always say, each defendant is a unique individual, and it's a challenge to do that. It truly is.

When I look at all of this, I will vary downward. I will go below guideline range, and I will do that -- it would be the equivalent of, say, a two-point further variance downward, and I'm going to impose 57 months in the custody of the Bureau of the Prisons. I think that's sufficient but not greater than what's necessary, given everything I know about your case and the other cases that have come before me, sir. I think it's sufficient but not greater than what's necessary.

Now, it's going to be followed by three years of supervision. And during those three years of supervision, if you violate any laws, state, federal, or local, you

could be brought back before this Court and serve additional time in custody. You will be deported, I'm certain, to your home country.

Have you reviewed the standard and mandatory conditions with your client?

*MR. WARREN:* Yes, your Honor.

*THE COURT:* Okay. All of those apply during the period of supervision, but the following special condition applies: If you're deported, excluded, or allowed to voluntarily return to New Zealand, sir, you're not to reenter the United States illegally, and you must report to probation within 24 hours of any reentry into the United States. Supervision will be waived upon your deportation, exclusion, or voluntary departure.

I'm not going to impose a fine. The $100 special assessment can be worked off while you're in custody.

Counsel, do you wish to ask for a housing designation?

*MR. WARREN:* Yes, your Honor. He has a friend of a family near Fort Dix, New Jersey, and so we'd request somewhere near there.

*THE COURT:* Okay. Somewhere near Fort Dix, New Jersey.

*MR. WARREN:* There's a facility near there. That's why.

*THE COURT:* Finally, in your plea agreement, on

page 19 of your plea agreement, you gave up your right to appeal or collaterally attack the judgment in this case and the sentence I just imposed.

Do you understand that?

*THE DEFENDANT:* Yes, your Honor.

*THE COURT:* Okay. We're going to give you copies of the conditions the Court imposed. You should keep that paperwork for your reference.

*THE DEFENDANT:* Okay. Thank you.

*THE COURT:* Anything I haven't covered? Probation? Mr. Warren? Government?

*THE CLERK:* There's an underlying count, your Honor.

*MR. HORN:* That can be dismissed at this point.

*THE COURT:* With regard to just this defendant?

*MR. HORN:* Exactly.

*THE COURT:* Okay. That request to dismiss with regard to this defendant is granted.

*THE DEFENDANT:* Thank you.

*THE COURT:* You're welcome.

(Proceedings concluded at 11:29 a.m.)

* * *

*C E R T I F I C A T E*

I, Stephanie Whitehead, certify that I am a duly qualified and acting Official Court Reporter for the United States District Court; that the foregoing is a true and accurate transcript of the proceedings as taken by me in the above-entitled matter on June 20, 2025; and that the format used complies with the rules and requirements of the United States Judicial Conference.

Dated: May 9, 2026

*s/ STEPHANIE WHITEHEAD*

Stephanie Whitehead, CSR 10093
U.S. Official Court Reporter